**NOT FOR PUBLICATION**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bounlom Khamsonphou,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner of the Social Security Administration,<br><br>　　　　　　Defendant. | No. CV-13-02239-PHX-SRB<br><br>**ORDER** |

Plaintiff Bounlom Khamsonphou applied for, and was denied, a period of disability and disability insurance benefits under the Social Security Act ("the Act"). Plaintiff then filed a Complaint with this Court to challenge that denial. (Doc. 1). The Court now considers Plaintiff's Opeing [sic] Brief ("Pl.'s Br.") (Doc. 19) and Defendant's Opposition to Plaintiff's Opening Brief ("Def.'s Br.") (Doc. 20). Plaintiff did not file a reply.

## I.   BACKGROUND

Plaintiff filed an application for a period of disability and disability insurance benefits on December 22, 2010, alleging that her disability began on September 9, 2009. (R. at 15.)[1] Her claim was denied initially on June 13, 2011 and upon reconsideration on

---

[1] Plaintiff's alleged onset date was originally September 9, 2009, which Plaintiff later amended to August 31, 2010. (R. at 235.) However, Plaintiff's counsel provided a different alleged onset date at the hearing—October 9, 2010—confirmed by Plaintiff in subsequent testimony. (R. at 52, 54.) Further confounding this issue is the ALJ's decision, which cites both September 9, 2009 and September 9, 2010 as the alleged onset date, and records that indicate that Plaintiff was laid off in September 2010. (R. at 17-18; *see* R. at 305.) Nevertheless, because the ALJ's opinion appears to primarily use

September 8, 2011. (R. at 15.) Plaintiff then requested a hearing, which was held before Administrative Law Judge ("ALJ") Philip E. Moulaison on July 12, 2012. (R. at 15, 25.) Plaintiff and Vocational Expert ("VE") Thomas M. Mitchell testified at the hearing. (R. at 15.) The ALJ issued an unfavorable decision on August 10, 2012 in which he found that Plaintiff was not disabled from September 9, 2009 through the date of the decision. (R. at 25.) The Appeals Council denied Plaintiff's request for review on September 3, 2013, making the ALJ's decision the final decision of the Commissioner. (R. at 1.) Plaintiff now appeals.

### A.     Relevant Medical Evidence

Plaintiff asserts that she is disabled due to pain in her right hand and right wrist. (Pl.'s Br. at 3, 13-14.)[2] Plaintiff does not appeal the ALJ's determination that Plaintiff's psychological condition was not disabling, and the Court limits its summary of the record to those portions relevant to Plaintiff's right wrist and hand. (*See* R. at 17-19.)

#### 1.     Treating Sources

##### a.     Advanced Arthritis Care & Research

Plaintiff visited Advanced Arthritis Care & Research throughout 2010 for treatment of her right wrist, hand, and arm. (R. at 472-79.) On April 30, 2010, she reported pain, swelling, and redness in her right wrist for the previous two months, and rated her pain as a five out of ten. (R. at 478.) Examination by Nurse Practitioner Maria Nasta revealed positive erythema, swelling, and edema in her right wrist, but negative tenderness, erythema, and edema in the small joints of her hands. (R. at 479.) Plaintiff had good range of motion in all joints except her right wrist, which was limited by discomfort. (R. at 479.) She was assessed to have right de Quervain's tenosynovitis and

---

Plaintiff's original September 9, 2009 date and Plaintiff does not challenge this date on appeal, the Court will review Plaintiff's arguments based on the alleged onset date of September 9, 2009. (*See* R. at 15-18, 25; Pl.'s Br. at 2.)

[2] While Plaintiff testified at the hearing that she also suffered from pain in both arms, and various records indicate that Plaintiff visited treating sources for complaints of arm pain, Plaintiff limits her arguments to alleged disabilities in her right wrist and hand. (*See* R. at 56-57, 313, 478; Pl.'s Br. at 13-14.)

right wrist pain. (R. at 479.) Ms. Nasta diagnosed Naprosyn and injected Plaintiff's wrist with bupivacaine and Celestone to help relieve some of her pain. (R. at 479.)

Plaintiff returned on June 23, 2010, reporting that "she had some minimal relief with the injection" but still had difficulty working. (R. at 476.) Plaintiff was prescribed prednisone and Vicodin and recommended to undergo an MRI for her right wrist. (R. at 476.)[3] On July 19, 2010, Plaintiff reported increased pain in her right wrist, but noted that the prednisone offered "mild relief." (R. at 474.) She continued to have trouble at work and admitted that she was not resting or wearing a splint. (R. at 474.) Plaintiff received another injection in her wrist and given a prescription "for modified work duty with the right hand." (R. at 474.)

On August 5, 2010, Plaintiff reported a "significant decrease in right hand pain" after her previous injection. (R. at 473.) She continued to wear a brace at work, but was afraid of losing her job if she moved to "light" duty. (R. at 473.) Ms. Nasta noted that she had a "significant language barrier" with Plaintiff, which caused some difficulty explaining the medications, or understanding which medications Plaintiff was taking. (R. at 473.) Plaintiff was continued on regular duty at work and she indicated that she would use a wrist brace. (R. at 473.) Ms. Nasta again diagnosed Plaintiff with right deQuervain's tenosynovitis and right wrist pain, along with tendinosis and osteoarthritis of the first carpometacarpal joint. (R. at 473.)

### b.     Southeast Valley Medical Group

Plaintiff was also treated at Southeast Valley Medical Group from 2001 to 2010 for a variety of ailments. (*See, e.g.*, R. at 305-424.) Plaintiff's first visit relating to her right wrist or hand in the relevant time period was on February 2, 2010, when she complained of right arm and wrist pain radiating up her forearm, "which resulted while [at] work." (R. at 313.) Plaintiff related to Physician Assistant Marti Neave that her

---

[3] Plaintiff completed the MRI at evdi Medical Imaging on July 9, 2010. (R. at 450.) The MRI revealed mild to moderate deQuervain's tenosynovitis with moderate tendinosis, accounting for the area of Plaintiff's pain and swelling in the "radial aspect" of her right wrist, along with mild to moderate osteoarthritis of the first carpometacarpal joint. (R. at 450-51.)

- 3 -

1  condition began several weeks before and that her arm and wrist pain was aggravated by
2  walking and relieved by nothing. (R. at 313.) After an examination revealed swelling and
3  pain in her right wrist, Ms. Neave ordered an x-ray of Plaintiff's wrist and referred
4  Plaintiff to a hand surgeon. (R. at 314.) Plaintiff returned on April 6, 2010 complaining of
5  the same pain, but admitted that she did not visit the hand surgeon as recommended. (R.
6  at 311.) Plaintiff was assessed to have pain, tendonitis, a "[s]prain-[s]train" in her right
7  hand and wrist, and osteoporosis. (R. at 312.) She was prescribed vitamin D and calcium
8  and referred again to a hand surgeon and rheumatologist. (R. at 312.) On a visit for an
9  unrelated matter on August 2, 2010, she reported right wrist pain on a scale of six out of
10 ten, but a subsequent examination did not indicate the status of her right wrist or hand.
11 (R. at 308-09.) On September 17, 2010, Plaintiff returned for complaints of lower back
12 pain and right wrist pain and indicated that she was recently laid off. (R. at 305.) Plaintiff
13 reported that she had been going "off and on" her medication and that she was unsure that
14 she would continue to use her medications. (R. at 305.) A physical examination revealed
15 "good" range of motion in her hands. (R. at 306.)

### 2. Examining Physicians

#### a. Dr. Jeffrey Levison, M.D.

Dr. Jeffrey Levison examined Plaintiff on May 11, 2011 and completed an accompanying "Medical Source Statement of Ability to Do Work-Related Activities ("Physical")" ("MSS"). (R. at 486-91.) Dr. Levison noted that Plaintiff "ha[d] a very normal examination from head to toe," and that he "closely examined both [of] her hands." (R. at 487.) Dr. Levison observed "no soft tissue swelling, no joint effusions, and no ligamentous laxity whatsoever" in her hands and a "Finkelstein sign was negative bilaterally." (R. at 487.) She had "no abnormalities about her wrists or hands," full range of motion in her wrists, and five out of five grip strength. (R. at 487.) Dr. Levison concluded that while Plaintiff had a history of deQuervain's tenosynovitis, it "appear[ed] to be resolved at this point in time," and that there was "nothing limiting about her hands and wrists." (R. at 487-88.) His MSS reflected this conclusion. (R. at 488.)

### b.  Dr. Quirino B. Valeros, M.D.

Dr. Quirino B. Valeros examined Plaintiff and completed a Physical Residual Functional Capacity ("RFC") Questionnaire one day before Plaintiff's hearing—on July 11, 2012. (R. at 504, 508.) He observed normal range of motion in Plaintiff's left hand and wrist, except for "typical Heberden's nodes present on the distal phalanges of the second and third fingers of the left hand." (R. at 506.) Plaintiff's right hand "exhibited edema and tenderness upon palpation of the small joints," and had a limited range of motion. (R. at 506.) Plaintiff also had tenderness and swelling over the thumb side of her right wrist, up to her forearm. (R. at 506.) Dr. Valeros noted that a Finkelstein test was positive for tendonitis, and a Jammar dynamometer test revealed two pounds on the right hand and five pounds on the left hand. (R. at 506.) He concluded that Plaintiff was unable to continue working because "her field of work demands specific fine motor skills of her right hand." (R. at 506.)

Dr. Valeros's handwriting on the Questionnaire is mostly indecipherable. (*See* R. at 508-09.) However, he indicated that Plaintiff was could rarely lift and carry ten pounds with her right hand and could occasionally carry twenty pounds with her left hand. (R. at 508.) Plaintiff could also rarely grasp, twist objects, turn, or use her fingers for fine manipulation with her right hand, while she could frequently do those activities with her left hand. (R. at 509.) Plaintiff could occasionally reach overhead with her right arm, and frequently reach overhead with her left arm. (R. at 509.)

### 3.  Non-examining Physicians

### a.  Dr. Jean Goerss, M.D.

Dr. Jean Goerss reviewed Plaintiff's medical record and completed a Physical Residual Functional Capacity Assessment on May 18, 2011 (R. at 78-81.) She found Plaintiff to be partially credible, in part, because "no objective evidence estab[l]ishes a degree of limitation[] approaching what she claims." (R. at 78-79.) According to Dr. Goerss's assessment, Plaintiff could lift and/or carry twenty-five pounds occasionally and twenty pounds frequently. (R. at 79.) Plaintiff could also stand and/or walk about six

hours per eight-hour workday, sit more than six hours per workday, and had unlimited ability to push and/or pull. (R. at 79.) She noted that Plaintiff could never climb ladders, ropes, or scaffolds and should avoid jumping from heights, but otherwise had no postural limitations. (R. at 80.) Plaintiff also had no manipulative, visual, communicative, or environmental limitations, except that Plaintiff should avoid concentrated exposure to vibration and all exposure to hazards. (R. at 80-81.) Dr. Goerss opined that Plaintiff's de Quervain's tenosynovitis "was not a repetitive motion injury but was inflammatory," and that "[h]er work assembling should not have any effect on this condition." (R. at 81.) In addition, there was no evidence of arthritis in any joint, except for the right wrist. (R. at 81.) Dr. Goerss concluded that Plaintiff was not disabled and could perform her past relevant work as an electronic assembler. (R. at 81-82.)

### b.   Dr. Melvin Roberts, M.D.

Dr. Melvin Roberts also reviewed Plaintiff's record and completed a Physical Residual Functional Capacity Assessment on September 6, 2011, which largely echoed the conclusions of Dr. Goerss's report. (R. at 91-95.) The only notable difference was Dr. Roberts's assessment that Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently. (R. at 92.)

### B.   Other Evidence

#### 1.   Plaintiff's Function Reports

Plaintiff's first Function Report, completed on April 16, 2011 by her husband, Manisakone Nadenbousch, indicated that Plaintiff's daily activities involved taking multiple medications to limit inflammation in her hands, legs, and knees, and limiting her work around the house. (R. at 203; *see* R. at 194, 201, 210.) Plaintiff had no problem with her personal care, but she did not prepare her own meals because she had trouble holding utensils. (R. at 204.) Plaintiff noted that she would shop for groceries one day a week for thirty minutes, but that she would not go out alone for fear of "sporadic inflammation." (R. at 205.) In part, Plaintiff noted that her condition affected her ability to lift, complete tasks, and use her hands, each of which she could do for only "about five minutes" at a

time. (R. at 207.) She revealed that she could lift only about five pounds. (R. at 207.)

Plaintiff submitted a second Function Report, also completed by her husband, on May 21, 2011. (R. at 211, 219.) While very similar to her first Function Report, Plaintiff indicated a few minor differences, including that she did light exercise during the day and that she could lift up to ten pounds. (R. at 212-13, 216.)

### 2. Third Party Function Report

Plaintiff's husband completed his own Third Party Function Report on April 15, 2011that did not differ substantially from Plaintiff's Function Reports. (R. at 194-201.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at the hearing held on her application for benefits on July 12, 2012. (R. at 51.)[4] She testified that she was fifty-eight years old, married, and right-handed. (R. at 53.) The highest grade completed by Plaintiff was fourth grade, in Laos. (R. at 53.) Plaintiff last worked on October 9, 2010, and testified that her current source of income was unemployment benefits that expired "about two or three weeks" prior to the hearing. (R. at 54.) Plaintiff's husband also did not work, but received disability benefits. (R. at 54-56.) She testified that she previously worked as an assembler at Rockford Fosgate and Comtech EF Data. (R. at 56.)

Plaintiff reported that her "most severe" medical issue was with her right hand and right and left arms, and that she was currently taking only two medications: ibuprofen and hydrocodone. (R. at 56-58.) Plaintiff had problems at work using equipment as a result of her condition. (R. at 57.) When asked to describe her limitations, in relevant part, she explained could lift one pound with her arms, and that she had pain in her arms and right wrist, which Plaintiff opined was due to working with her hands. (R. at 59-60.)[5]

---

[4] During the hearing, Plaintiff's counsel indicated that Plaintiff was seeing a new treating physician, Dr. Cazares, but Plaintiff did not present those records to the ALJ. (R. at 57.)

[5] Plaintiff also relayed a number of limitations that appear unrelated to her complaints of wrist and hand pain, including that she could climb a flight of stairs "but not very often," walk about "one block" before needing to rest, stand up less than five

- 7 -

Plaintiff would take medicine and get massages to relieve her pain. (R. at 60.)

She testified that she started seeing a doctor for problems with her right hand and wrist that developed at work. (R. at 61.) She claimed that the pain would start to flare up after about ten to fifteen minutes at work, at which time she would use her other arm to complete her work and take breaks. (R. at 62.) Plaintiff testified that this problem caused her to slow down at work, and she believed that it ultimately led to her termination. (R. at 62.) Plaintiff confirmed that she did constant precise work with her hands, and that this caused her radiating pain up her arms. (R. at 63-64.) She claimed that she could not clean, cook, or do laundry, understood only a "little bit" of English, and could write only her name. (R. at 64.) When asked if she looked for work after she was laid off, Plaintiff responded "[y]es, I look[ed], but nobody hire[d] me," and that she received unemployment benefits during that time. (R. at 65.)

### 2.     The VE's Testimony

VE Thomas Mitchell also testified at the hearing. (R. at 65-69.) He classified Plaintiff's past work as an assembler as semi-skilled and light. (R. at 67.) He opined that Plaintiff would not be able to perform her past work with the difficulties that she described in her hands, but would be able to perform assembly work at the sedentary, unskilled level. (R. at 67.) The VE testified that according to the limitations in Dr. Valeros's RFC Questionnaire, she would not be able to perform her past relevant work because "her right hand would be too limited." (R. at 68.) He opined that Dr. Valeros's medical opinion would prevent all work, because "[s]he needs to be able to use her upper extremities, at least on a frequent basis . . . bilaterally." (R. at 69.)

### D.     The ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) Plaintiff was determined to have

---

minutes at a time, sit for about five minutes before needing to move around, and that she had trouble bending over and tying her shoes. (R. at 58-59.)

the following severe impairments: osteoporosis, osteoarthritis of the first carpometacarpal joint of the right hand, and de Quervain's tenosynovitis in her right thumb. (R. at 18.) The ALJ concluded that Plaintiff did not have any impairment that met or medically equaled a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 20.) According to the ALJ's RFC, Plaintiff was able to lift and carry ten pounds frequently and twenty pounds occasionally, stand, walk, and sit for six hours (out of an eight-hour day), but could not climb ladders, ropes, or scaffolds, should not be required to jump from any height, and should avoid concentrated exposure to vibration and all hazards. (R. at 20.)

In making this finding, the ALJ found Plaintiff to lack credibility, listing several specific reasons for this determination. (R. at 22-23.) The ALJ also weighed the medical opinion evidence, assigning little weight to Dr. Valeros's opinion, little weight to Dr. Levinson, and considerable weight to Drs. Goerss and Roberts. (R. at 23-24.) The ALJ concluded that Plaintiff was capable of performing her past relevant work as an electronic assembler and that she had not been under a disability from the alleged onset date through the date of his opinion.

## II. LEGAL STANDARDS AND ANALYSIS

### A. Judicial Review of Agency Decisions

The Social Security Act confines judicial review to evidence within the record to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Id.* If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court must uphold the decision. *Id.* Reviewing courts cannot accept post hoc rationalizations for agency action and must limit their review to the grounds articulated in the agency's opinion. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th

Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

The Social Security Regulations set forth a five-step sequential process for evaluating disability claims. See 20 C.F.R. § 404.1520(a)(4). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four of the sequential process. *Id.*; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). At step five, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Tackett*, 180 F.3d at 1098; *Reddick*, 157 F.3d at 721.

Here, Plaintiff argues that the ALJ erred at step four by making an adverse credibility finding, improperly weighing Dr. Valeros's medical opinion, and by failing to question the VE on certain limitations. (Pl.'s Br. at 12-22.)

### B. Analysis

#### 1. Adverse Credibility Finding

The ALJ found Plaintiff incredible for five specific reasons: (1) her allegations regarding limitations with walking, standing, sitting, or climbing were not supported by any impairment; (2) she responded well to conservative treatment; (3) Plaintiff did not give full effort during a July 2012 examination by Dr. Valeros; (4) Plaintiff continued to receive unemployment benefits after she was laid off; and (5) Plaintiff did not stop working because of her condition, but was laid off. (R. at 23.) Plaintiff challenges only reasons three and four. (*See* Pl.'s Br. at 14-17.) Plaintiff does not dispute the Commissioner's argument that the remaining reasons are clear and convincing, and the Court agrees with the Commissioner. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (finding that a favorable "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); *Brackett v. Comm'r of Soc. Sec. Admin.*, 468 F. App'x 754, 755 (9th Cir. 2012) (affirming adverse credibility determination based, in part, on the fact that the claimant "stopped working only when he

was laid off due to a plant closure and told his physician that was the reason why he had stopped working").[6] Even if the ALJ erred in using reasons three and four as a basis for rejecting Plaintiff's credibility, the ALJ provided enough other clear and convincing reasons for rejecting Plaintiff's symptom testimony to make such error harmless. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

### 2. Dr. Valeros's Medical Opinion

Plaintiff also challenges the ALJ's assignment of little weight to Dr. Valeros's medical opinion. (Pl.'s Br. at 17-19.) Because other medical opinions contradicted Dr. Valeros's opinion, the ALJ was required to provide specific and legitimate reasons for rejecting his opinion. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). In part, the ALJ gave little weight to Dr. Valeros's opinion because it was inconsistent with other medical records. (R. at 23-24.) Specifically, the ALJ noted that Dr. Valeros's diagnosis of edema in the small joints of Plaintiff's right hand was inconsistent with the fact that Plaintiff had not been diagnosed with inflammatory arthritis and with Dr. Levison's examination that revealed no swelling of her joints. (R. at 23-24.) The ALJ also noted that the severity of Dr. Valeros's opinion was inconsistent with treating records that showed improvement with treatment. (R. at 24.)[7] The Court finds that these reasons are specific, legitimate, and supported by the record and the Court will not second-guess them on appeal. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (upholding the rejection of a physician's opinion because it was inconsistent with

---

[6] The Commissioner argues that the clear and convincing standard does not apply in this situation because Ninth Circuit Panels that have articulated that standard did not have the power to overturn existing precedent in *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991). (Def.'s Br. at 10 n.7.) This Court has repeatedly rejected this argument and does so again here. *See, e.g.*, *Nelson v. Colvin*, No. CV-12-1514-PHX-GMS, 2013 WL 4010860, at *8 (D. Ariz. Aug. 6, 2013); *Stewart v. Astrue*, 852 F. Supp. 2d 1153, 1160 n.1 (D. Ariz. 2012).

[7] Plaintiff does not contest these specific reasons, maintaining only that the ALJ's conclusion that "[e]dema in the small joints of only one hand is inconsistent [with] the claimant's known diagnoses of deQuervain's and mild to moderate osteoarthritis of the first carpometacarpal joint," was an improper medical conclusion. (R. at 24; Pl.'s Br. at 18.)

- 11 -

the medical record).[8]

### 3. VE Testimony

Plaintiff's final argument is that the ALJ erred by failing to ask VE Mitchell about limitations (e.g., ladders, ropes, scaffolds, heights, or concentrated exposure to hazards (including machinery)) that would have precluded Plaintiff from performing her past work as an electronics assembler. (Pl.'s Br. at 21.) However, as the Commissioner argues, the ALJ was not required to use the VE at step four. *See Ellis v. Astrue*, No. 2:11-CV-00922-KJN, 2012 WL 4207458, at *8 (E.D. Cal. Sept. 18, 2012) ("Case law is in accord that at step four an ALJ's determination that a claimant can perform past work need not be supported by the testimony of a vocational expert.").

## III. CONCLUSION

The Court affirms the decision of the Commissioner of Social Security. The ALJ did not err in making an adverse credibility finding, weighing the medical evidence, and questioning the VE. The ALJ applied the correct legal standards and his decision is supported by substantial evidence.

**IT IS ORDERED** affirming the decision of the Commissioner of the Social Security Administration.

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

Dated this 31st day of July, 2014.

Susan R. Bolton
United States District Judge

---

[8] Plaintiff also argues that because non-examining physicians Drs. Goerss and Roberts never examined Plaintiff, nor reviewed Dr. Valeros's examination, "their opinions cannot be considered substantial evidence and were not sufficient to rebut the opinions of Dr. Valero[s] [n]or support the ALJ's RFC." (Pl.'s Br. at 20.) But Drs. Goerss and Roberts conducted their reviews almost one year before Dr. Valeros, and Plaintiff cites no authority that required the doctors to review Dr. Valeros's findings. (*See* R. at 81, 95, 504.) Moreover, non-examining physicians' opinions may be considered substantial evidence even though they did not examine or treat the plaintiff. *See Magallanes*, 881 F.2d at 752 ("[T]he reports of consultative physicians called in by the Secretary may serve as substantial evidence.").